Secretary of the Treasury, Mr. Lavecchi for the appellants, Ms. Barbero for the appellate. Good morning. May it please the Court. In 2008, the District Court issued an injunctive order mandating that U.S. currency be made accessible to individuals with visual impairments. For reasons that are completely unrelated to any difficulties in making the currency accessible, the Council submits that a delay of 18 years in making the first denomination of currency accessible is both unwarranted, unreasonable, and unnecessary. Can I ask you a couple of questions? First, I know when Judge Robertson had the case, he said there is no data showing that the blind and visually impaired use cash more than sighted people. And is that still the case? It just seems to me that in this cashless society we're going to, that the blind and visually impaired are left out of that. I think that's true. I think that there's, and certainly when it comes to technology, smartphone technology, which is in any cashless society the lodestone of a cashless society, smartphone technology is largely inaccessible to persons with visual impairments because of the flat touch screen. So as a result, the much ballyhooed cashless society, which clearly we have not arrived at yet, and probably never will in our lifetimes, the much ballyhooed cashless society probably will present a whole new set of challenges for people with visual impairments. Okay. Because of Okay. The other question I had was, is my math correct that with these iBill readers and the iPhone and Android, that has been used by roughly 4% of the blind and visually impaired, figuring 3,090,000 using either one of those machines. I think it's probably less than 4% because we have the visually impaired population and the society runs into the millions. It's partly a function of just demographic changes in our society as the baby boomers are getting older. That was certainly a factor in the increasing numbers of visual impairments. So I think that is probably on the high side, 4%. Okay. I would like to bring to the Court's attention a recent decision from this Court in 2017, Government of Manitoba v. Zinke, 849F3R1111, in which the Court of Appeals said that a change, significant change to either factual or legal circumstances, requires modification of an injunctive order, assuming doing so would be in the public interest. And I think that was a case that we did not cite in our briefs, but I would like to bring that to the attention of the Court. Can I just ask you a question? You started out by referring to, I think, an 18-year delay. Is that the years that you calculated? Well, it's not necessarily a delay of 18 years. 2008 is when the District Court issued its injunctive order. Assuming the target date of 2026 is met, the injunctive order the first denomination of currency would be made accessible in 2026. That's how I computed the 18-year period. An 18-year period, right, because there was some there was everybody expected at the time that the order was entered that there was going to be some period before which you would have a redesigned currency. That's correct. That's correct, Your Honor. Okay. So we're talking about the incremental deferment beyond the expected period that was already built into the order. Yes. Yes, Your Honor. That's correct. And that's with respect, again, I emphasize to the first denomination, because as to the subsequent denominations, they will go further out. Do we know how much further out that will be? In other words, are you arguing that there's a delay in getting started? Is there only the delay in getting started? Yes, Your Honor. I think we have something of an answer to that question. In a recent filing within the past month at the District Court, it's not part of the record, but it there would be five separate redesigns between the government actually wrote a letter to a member of Congress stating there would be five separate redesigns between 2026 and 2038. So that would be effectively a redesign every two years. Now, first of all, that is an internal working timetable set by the Bureau of Engraving and Printing. Technically, the Bureau of Engraving and Printing does not even have the authority to establish a target date for the issuance of currency. That can only be done through a recommendation made by the Advanced Counterfeiting Deterrent Committee, which is composed of representatives of the Secret Service, of the Federal Reserve Board, and the BEP. And they would make a recommendation to the Secretary as to a target date. So this is essentially an internal time frame, that internal working time frame that the Bureau of Engraving and Printing. And I think that's significant as well because one of the issues raised by the government in this case is that a redesign in 2020 and another redesign in 2026 would be confusing to the public. But that argument is certainly belied by the fact that the government is planning five separate redesigns within a 12-year period. That's approximately one redesign every 2.2 or 2.3 years. So it strikes me as apocryphal that, on the one hand, the government could state that a redesign in 2020 and a redesign in 2026 would be confusing, when at the same time, according to its letter to Senator Wyden, they plan themselves on a redesign every 2.5 years. Are these redesigns the portrait changes or are they anti-counterfeiting, or does the letter say? No, I think the letter indicates that the redesigns are major redesigns for security purposes. I guess I would just defer. I didn't see anything in the briefs on it that a change in a different denomination would present less confusion than two changes in each denomination in successive years. I think it's correct, Your Honor. I think that's correct. And I don't see how that would be the case. And I think it's also worth noting... I'm sorry. I'm not sure what you're saying. In other words, if the RTF goes ahead on a schedule ahead of, possibly way ahead of, the change for anti-counterfeiting, would that mean each denomination having two changes? Well, it depends on how the scheduling would line up. But the proposed order we asked for was that the $10 bill would be redesigned, and only the $10 bill would be redesigned in 2020. In 2026, it would probably be necessary, and the letter to Senator Wyden indicates that another redesign of the $10 bill would occur in 2026. So then there would be, at that point, two redesigns. So what we're asking, essentially, is that the remaining denominations of currency be redesigned in 2026. If that is the case, then yes, there would be another redesign for each I don't place much stock in these internal working deadlines set by the BEP, because in the past, they've been way off the mark. I understand that. I think it's important to state that the council is not seeking any... forcing the government to provide any specific accommodation. That's not what we're asking for. We're not seeking any particular accommodation. It's really within the government's discretion as to what is the best accommodation. We've taken that position since the inception of this litigation in 2002. I'm sorry, you mean within the realm of RTF? No, Your Honor, we're not... the RTF was not something that was even proposed by the council. The RTF was something that the Secretary decided upon based upon his view that it would be durable, effective, and not unduly burdensome. That was a determination made back in 2011. It was certainly not our proposal to put an RTF on the bills. It was the government's decision. What would be other... it seems like the main options that have been discussed in the briefing and in the materials are RTF, increasing the size of the images, and some sort of reader. Is there something else that is a possibility? It's not so much, Your Honor, increasing the size of the images. It's increasing the dimensions of the currency by denomination. In other words, the $50 bill would be larger than the $20 bill and that. The government chose not to do that. That's what most countries do. The government decided to do the RTF instead of changing the size because the government believed that it would be less expensive, put less pressure on the banking system, make it less expensive for the banking system, probably less expensive for the government as well. The other options, of course... there are other options. Other countries, as indicated in this Court's decision in 2008, do other things. There's FOIL features that are used, perforation features that are used. There's a number of features. I think the point I was trying to make is that the government certainly has the discretion to decide which features are correct. But with respect to the external currency readers, our position is that those readers do not provide meaningful access because there are other more integrated and efficacious methods available that would not be unduly burdensome. So in our view, and the record as it is now, the external currency readers do not provide, cannot provide as a matter of law, meaningful access. If there are no further questions, I reserve the remainder of my time for your question. May it please the Court. Megan Barbero on behalf of the Secretary. And I wanted to start with this question that came up about the redesigns. And plaintiffs are effectively asking for two separate redesigns for each denomination. And also to clarify, the redesign for security purposes, to fulfill the statutory obligation to design the currency in the best manner to counteract counterfeiting, that's one redesign that's planned. It's now been pushed back because of developments in counterfeiting technology. But the rollout of the denominations are all done in an orderly manner, but that's a single redesign for security reasons with a rollout of the bills to allow them to be introduced into circulation in an orderly manner. So does that, for security purposes, indicate that once one denomination has been redesigned, the others flow fairly quickly? That, if we look back, so the most recent redesign was, you know, this, I believe began in 1996, but then there was rollout beginning in the early 2000s. And those denominations were rolled out fairly quickly, but there was some delay in the most recent redesign for security purposes for the $100 note. And if you look at the projected time frame and then when those notes were actually released, there's certainly some delay there. And in addition to that, looking back historically... Is that because there's been progress on the part of counterfeiters? Certainly, because if you, historically, you needed to have, you know, a printing press effectively to counterfeit bills. Now you've got color scanners, people with color printers in their home, ubiquitous computing devices. The technology in counterfeiting is advancing quite rapidly. And again, the Secretary is making best efforts to address those security concerns and to release a redesigned family of notes that will be secure against those security threats. At the same time, however, the Secretary adopted a three-prong approach to provide meaningful access to the currency. The Secretary, as we have detailed in numerous status reports, detailed status reports in the District Court, including the 18th status report that's docket number 156, which was filed most recently, the Secretary has made substantial progress in providing meaningful access through the three-prong approach. Now one of those prongs is, of course, the... I come out with 4%. I mean, with these readers and these iPhone and Android features, you have provided meaningful access to 4% of the blind and visually impaired. We have... I mean, that number sounds approximately correct. We have, as of September, as indicated in the most recent status report, 55,000 iBuild readers have been distributed. That distribution program just started in 2015. It's been widely publicized. BEP employees have gone to numerous conferences, released... have an extensive public education campaign around the iBuild reader, have received positive feedback. We're not arguing that that alone provides meaningful access, but the reason there's a three-prong approach is because the currency reader can provide immediate access, while the Secretary is continuing to research and develop the Raise Tactile feature. And in addition to the currency readers, of course, there are the smartphone applications, which is a new technology that BEP has supported and helped assist in the development of. We've seen 47,000 downloads of those currency readers onto smartphones. And in addition, as we've explained to the District Court, and the District Court is well familiar with the record in this case, there have been significant efforts on the part of the Bureau to develop a tactile feature that works well, which is not something that anyone knows how to do. Plaintiffs have pointed to other currencies, for example, that have tactile features. But as was noted in the study that the Bureau conducted, the tactile feature on the Canadian currency, which I believe is about 140 microns compared to Braille, which is about 400 microns, wears down very quickly. Because, of course, notes, unlike a Braille book or something else on which you might find Braille, they're passed back and forth from person to person, they're stuffed in pockets, they go through laundry machines, they wear down very quickly. And on the Canadian notes, with notes that have been in circulation, it's less than 50 percent, or around 50 percent, varies from 30 to 60, I think, depending on the bill. But in terms of the ability of somebody who is blind to identify the note. Now, can I just ask this question about the timing? So it seemed like the assumption that we're all talking about was that roughly 7 to 10 years was the time frame for a redesign? That was, historically, had been the case. Right. If that's historically been the case, then let's just assume that everybody kind of had in their minds that that's roughly what's going to happen in the future. Then the schedule that's been laid out by the other side is that a redesigned currency that satisfies the needs of the visually impaired would be issued in 2000. And then the government says, well, that doesn't make a lot of sense to add that layer on when we're going to have a currency released in 2026, under the current schedule anyway. And so I understand that as a general matter, that you could have some inefficiencies that attend doing things in succession. But the gap is six years, which seems like the gap already assumed by everybody was something like 7 to 10. So aren't we talking about redesigns on a schedule that is roughly the same schedule that was put forward at the time of the initial order to begin with, or are we not? Well, if I may, it would be roughly six years. But again, the district court was well within its discretion in looking at your undermentioned inefficiencies. And these are significant, especially when you're talking about adding a tactile feature and significantly enhanced security features to the bills. And this is discussed in the declarations of Larry Felix that were submitted in connection with the original injunction and the 2012 motion to modify. But every time you redesign the currency, you're talking about modifying all of the equipment at the EP. There's an entire team at the Bureau that works on this. And not just that, but as Theresa Fines explained to the district court. Well, that's not necessarily true, because according to Walsh, he comes up with a figure of 66 million if you do have to change the machines. If you don't, and he allows for that, it's 5 million. That's correct. And so we don't know exactly what the costs are. But what we do know is that the costs are going to increase significantly if we have to do two separate redesigns, as indicated here, which was one redesign that would allow for the efficiencies of doing both the tactile feature and the security redesign at the same time. But it also anticipated it would be done within 7 to 10 years, and you've doubled that time. Well, we were very clear with the district court before the injunction was entered in our memo regarding the injunction that the redesign for security features was not on any schedule, per se. The plaintiffs had suggested... You don't see it that way. He said he just learned that it was required to do this anti-counterfeitering redesign every 7 to 10 years. Now, he may have been exaggerating what the Treasury fellow said, because I think he said this is our normal cycle. But he read it, or interpreted it to mean that was a requirement. But I want to ask you about the latest year that I saw for your revenue was, I think, 2004, half a billion dollars. How much of that revenue is going to these portrait changes? Do you know? I do not know the answer to that question. All right. Would you agree that certainly the visually impaired have a priority over changing the expenses or the costs of changing currency with respect to whose face is on the currency? There is absolutely no... There's no suggestion in the record that the Secretary has been doing anything other than exercising best efforts to implement the three-prong approach, including dedicating significant resources to the development of the tactile feature. That includes a focus group with 50-plus participants, including members from the American Council of the Blind, that was just concluded earlier this year. They've now narrowed down the potential tactile features that are being considered. The problem is that there are substantial challenges in developing the tactile feature, including the tactile features in this most recent study, the ones that were most effective and accurate. Participants, even with those, had a low level of confidence that they were actually determining the currency correctly. So there are all these difficulties in coming up with a tactile feature that works well. What would the government do if the date that was asked for were, in fact, implemented? Because there's two large series of objections to that. One is that it doesn't make sense to do it because there's going to be another iteration for counterfeited reasons anyway, and then this is going to result in a great deal of inefficiencies that are potentially disturbing the broader cause. The other is that we've decided that the way to go forward is the RTF, is the tactile feature, and that's just not physically possible to do anything by 2000. I don't think there's support in the record for the idea that it would be feasible to implement the tactile feature by 2020, in particular because, as is detailed in the WASH declaration and Mr. Felix's declaration, even once the Bureau settles on a tactile feature, there's still, because it's a change to the currency, a significant rollout period. The notes have to be tested. Of course, there have to be changes to everything that uses cash in the economy. That includes vending machines, cash drawers, ATMs, public transportation systems. All of that takes a significant amount of time. So even once they settle on a tactile feature, it's still a process. But again, the District Court has been carefully monitoring this case, and in considering whether the plaintiffs had shown that the current injunction under which the Secretary is implementing this three-prong approach was now detrimental to the public interest, the District Court was well within its discretion to find that no, given the substantial progress that had been made... Four percent? That's substantial progress? Your Honor, the District Court found that it was substantial progress both in the... I know, I know, that's in there. Yes, both in terms of the currency readers. And again, if you, I mean, we can pull apart the numbers more, but there, in addition to the currency readers that the Bureau has distributed for free, there were commercially available currency readers that individuals may have purchased before that plan. There, some of those individuals are not in commerce. I'm not suggesting, and we have not argued, that the currency readers standing alone are providing meaningful access. They're just part of this plan because they're immediately available. All right, let me ask you about the private sector costs, because Mr. Walsh, again, just says, we've estimated a cost impact of $3 to $4 billion. Now, when you read that with the background of what Judge Robertson found with the statistics that Treasury put forward then, and they were just wildly hyperbole, and in his footnote 10, granted this is 10 years ago, he said, there's little information about the effect of currency changes on third parties. The vending machine people say, yes, maybe not. And then he says, that whole study is skewed because they left in the $1 bills, which, of course, is not in any way affected by the raised tactile feature. And so, if the currency you've got to produce, one half of it doesn't have to comply with the order of the RTF, why should we just assume that Mr. Walsh, who says, we anticipate $3 to $4 billion to the private sector, just where does that come from? There's nothing in here to support it. And he even says, it may be declaration sets out countless meetings and confabs and tests and so forth. And it just seems like for years, you all have been dealing with this and gotten nowhere. And here you are with 4% of the visually impaired getting meaningful access after 10 years, and now they have to wait another nine years. If I may, Your Honor, the AIRINC study, which the Bureau commissioned, was a comprehensive study. This is in the record. I think it's around JA 590. I know that's part of the study. Looked at all of the equipment manufacturers, the impact on them, the vending machines, all of that. There is support for all of that in the record. But in addition, if I could point out that those costs are costs that will occur whenever the raised tactile feature is incorporated. So we're not saying that because this is going to be particularly expensive, we shouldn't do it. What we're saying is, this is going to be incredibly expensive. We should do it in a way that makes sense, that is efficient, where we have the best tactile feature developed, which we are continuing to study and research. And I understand that it has taken time, but this has been a global challenge for years to find a tactile feature that is durable, effective, manufacturable, usable. These are difficult things to do. And what the Bureau, what the District Court did in this case was carefully craft an injunction that would allow the Bureau and the Secretary, in his discretion, to develop a plan for providing meaningful access. We've done that. We've implemented that plan. We're continuing to implement that plan. And the District Court was well within its discretion in finding that doing that in conjunction with the statutorily required redesign for security threats made good sense. And even looking back at the record in 2012 and 2017, when there had been some delays, the District Court looked at all the progress that had been made, not just in the currency readers, but also in adding larger numerals that assist the visually impaired in denominating the currency and the high contrast numbers and said it would, it's not, the plaintiffs have not satisfied their burden of showing that the injunction needs to be modified to impose a date certain on the Secretary. Can I just ask this? If this timeframe continues to extend, so suppose for every good reason, I don't doubt the good faith of predicting these timeframes. So let's suppose that 2026 starts to come up, and then it turns out there's a whole new wave of counterfeiting that needs to be taken into account, and it turns out that the next iteration isn't going to deal with that. And so the realization is made, actually, we should defer, and let's go to 2035. I mean, at some point, the way that the letter, from the letter of the injunction, the timeframe for redesigning the currency to deal with this would extend commensurately. But at some point, it can't be that just every time that there's a need to defer things for counterfeiting purposes, that means that automatically there's a deferment for these purposes, too. And at that point in 2026, or whenever that arose, the district court would be looking at the public interest, determining whether the current injunction, which linked meaningful access to the counterfeiting redesign, whether that was still in the public interest, or whether circumstances had changed such that plaintiffs could satisfy their burden at that point. And, of course, in addition, given the significant technological developments in, you know, these smartphone applications, which... I wanted to ask about that. First, has there been progress up to this moment in that, I mean, since it was originally developed, and is there significant progress anticipated in that? The answer is yes to both questions. If you look at...this is document number 156 in the district court record. It's our 18th status report to the district court. That discusses both the number of downloads of the smartphone applications that have been developed, and also refers to Microsoft's recently released Seeing AI, which is a free application for Apple devices that reads documents and describes objects for blind and other visually impaired persons using the built-in camera. Now, we understood that Microsoft... Is there a way of communicating that to the visually impaired person without something public? Right, and that is a concern in terms of the security of those applications, but both the iGo currency reader and also the smartphone applications can be used with an earpiece, so you can have the information communicated to you directly where others can't hear it. They also operate on vibrate...with a vibrate function, so they'll vibrate, you know, a different number of vibrations or beeps, depending on the setting you have. Can it be done in a pocket or a pocketbook? That I...I don't...I don't know, but I...there has been an effort to ensure that those are secure for use in public. What would be wrong with our remanding it for...because the cost on one side of the scale is the cost to the Treasury. On the other side is 96% of Americans who have a right to meaningful access to the currency. What would be wrong with remanding it for a more specific finding as to the cost of delinking it from the anti-counterfeiting? If we...if we take away the private sector costs, because 4 to 6 billion just comes out of nowhere, and we concentrate on the Treasury costs, that can vary from 66 million to 5... to go down to 5 million. What's your answer to that? I...I just see this as not having been established by a mile that...that the equities, and that's what we're looking at under 60B5, if it's equitable to continue this injunction the way it is. So, there is ample support in the record, and I want to emphasize that, and the district court's order is...it's well-reasoned, it's relatively short, but in part that I'm sure is because the district court... It's just as vague as it can be. It's as vague as it can be. It... It's three pages. It's...the district court refers, though, to the declarations that were submitted, which build on...this is a, you know, a 12-year record in the district court. The Bureau has conducted... But we're dealing with the declaration of WASH, which I've just gone over, which pulls 4 to 6 billion out of nowhere, which varies from 66 to 5 million for the public costs. Well, does anyone have any more questions? Okay. And if I may just also refer you back to Mr. Felix's earlier declarations in the case which further support this point, and the studies that the Bureau has commissioned. All right. Thank you. Thank you. How much time does he have? Okay. Your Honor, I believe this court said in 2008 that the redesign of currency for accessibility purposes is no less a statutory objective than the redesign of currency for security purposes. And I think that's important to keep in mind as to the Secretary's, Consul's discussion of smartphones. In addition to being inherently inaccessible, the better smartphones that have the better software, such as the Apple software, are very expensive. And it strikes me as just very unfair to require people who are visually impaired to be required to buy their way into access to U.S. currency, any more than somebody who is visually impaired ought to buy their have to pay to get into a wheelchair ramp into this court. Now, with respect to the issue of the durability issue, well, the fact is, and as noted by this Court's opinion in 2008, many other countries are using durable tactile features. I'd refer this Court to pages 1271 to 1272 of the reporter's decision in American Counsel of the Blind v. Dan Paulson. Many other countries are using durable tactile feature. In fact, I just happened to find that the new 10-pound U.K. banknote is very obvious,  It's not a problem. And it was the government who chose the RTF back in 2011 because they said it would be durable. And now they seem to be spinning their wheels on this. And even if a tactile feature is worn, that's nothing to prevent a person with a visual impairment to ask for a different bill. Easily accommodated request from a cashier. With respect to the cost issue, I think it's fair to say that the Walsh Declaration, the additional cost he cited to the government of putting in the RTF would be cost that would be incurred in any event, whether or not the two redesigns were paired or separated. And as to the anticipated... What supports that? Are you saying that two redesigns cost doing separate things cost the same as one redesign doing both? Anything in the record supporting that? No, I don't believe that's it exactly, Your Honor. My point was more that the specific cost cited by Mr. Walsh in his declaration would have been incurred regardless of whether those costs for making the feature, to buy the equipment, and to make this durable tactile feature would be incurred, have to be incurred, even if the two redesigns... I guess at least intuitively it sounds to me as if he was arguing that there are significant economies of scope and that going ahead decoupling would increase those. Oh, unquestionably true. That's why the district court, I think, ordered it in the first place, to allow them to put the two together. I think it comes down to, yes, I think you're absolutely right. I just don't think there's anything in the record on that. You've gone over your time. Okay. Thank you.
judges: Henderson, Srinivasan, Williams